# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. CR-25-146-PRW |
| JUSTIN DAVID GILLILAND, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Before the Court is Defendant Justin David Gilliland's Motion to Dismiss the Superseding Indictment (Dkt. 50). The United States has responded in opposition (Dkt. 51) and a hearing was held (Dkt. 58). The Motion is ready for decision.

### *Factual Background*

Because this is a motion to dismiss an indictment for failure to state an offense, brought pursuant to Federal Rule of Criminal Procedure 12, the facts are limited to those found within the four corners of the indictment, along with certain undisputed facts relating to the various protective orders that underlie the indictment.[1] Dismissals under this Rule "are not made on account of a lack of evidence to support the government's case, but

---

[1] *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994).

because undisputed evidence shows that, as a matter of law, the Defendant could not have committed the offense for which he was indicted."[2]

## I.    Count One

The Superseding Indictment charges two alleged violations of 18 U.S.C. § 922(g)(8). According to Count One of the Superseding Indictment, on October 18, 2024, Justin Gilliland possessed a .22LR caliber rifle. The indictment alleges that this possession was unlawful because on that date Gilliland was a prohibited person due to his being subject to a protective order sought by his ex-wife in Comanche County District Court. More specifically, the indictment alleges the following:

> At the time he possessed the firearm, JUSTIN DAVID GILLILAND was subject to a court order issued after a hearing of which he had received actual notice, and at which he had an opportunity to participate. That court order, specifically in PO-2024-448, issued on or about July 17, 2024 and ordered in full force and effect after a hearing on August 22, 2024, by the District Court of Comanche County, Oklahoma, restrained him from harassing, stalking, and threatening an intimate partner as defined by Title 18, United States Code, Section 921(a)(32), and restrained him from engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner, and explicitly prohibited the use, attempted use, or threatened use of physical force against such intimate partner that would reasonably be expected to cause bodily injury.[3]

It is undisputed that the July 17, 2024 protective order was an "emergency ex parte order of protection" that was issued without a hearing and without notice to Gilliland. The emergency order set a hearing on the protective order for August 22, 2024. Gilliland

---

[2] *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006).

[3] Superseding Indict. (Dkt. 44), at 1–2.

received notice of that hearing and was present. The parties dispute what precisely happened at that hearing and whether Gilliland had an "opportunity to participate."

What is undisputed about August 22, 2024, is that an order was issued on that day. That order is not styled as a "protective order." Instead, the order says the matter came on for hearing and "FINDS and ORDERS that the Emergency Protective Order shall remain in full force and effect pending further hearing before the undersigned Judge," to be held on November 15, 2024.[4] The order directed that all parties appear at the hearing and further found and ordered that "the defendant(s) is restrained and prohibited from any and all intentional and avoidable contact with the Petitioner(s) except as is otherwise allowed by appropriate court order(s)."[5] At the bottom of the order there is a place for both parties to sign acknowledging the order, which they did.

The record does not reflect what happened on November 15, 2024, other than that the court issued yet another order just like the August 22, 2024 order, again continuing the hearing (this time to March 27, 2025) and again ordering that the July 17, 2024 emergency ex parte order of protection "remain in full force and effect pending further hearing."[6]

The parties agree that a "final" order of protection was issued on March 27, 2025, and that Gilliland was present. Neither that final order of protection nor the court docket reflects whether a hearing occurred on that date.

---

[4] Aug. 22 Order (Dkt. 50-2), at 1.

[5] *Id.*

[6] *See id.* (setting the next hearing for November 15, 2024).

II.    **Count Two**

Count Two of the Superseding Indictment alleges that between March 28 and March 30, 2025, Gilliland possessed ten firearms. The indictment alleges that Gilliland's possession of those firearms was illegal because he was subject to two separate final orders of protection at the time: (1) the March 27, 2025 Comanche County final order of protection described above and (2) a January 23, 2025 Grady County final order of protection granted to Gilliland's adult daughter.

Count Two states that the March 27, 2025 Comanche County final order of protection was issued after a hearing of which Gilliland had actual notice and an opportunity to participate, and that the order restrained Gilliland from harassing, stalking, and threatening an intimate partner, restrained him from engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner, and explicitly prohibited the use, attempted use, or threatened use of physical force against such intimate partner that would reasonably be expected to cause bodily injury.

This March 27, 2025 final order of protection was issued based on a Petition for Protective Order filed by Lisa Carpenter (Gilliland's ex-partner) on July 17, 2024. In that Petition, Ms. Carpenter alleged that she was a victim of domestic violence/abuse, harassment, and stalking at the hands of Gilliland. The final order of protection, however, does not contain any finding as to whether domestic abuse or stalking had or had not occurred. The portion of the order where such a finding is to be made is left blank. The order does not otherwise specify what conduct was found to have occurred to support the issuance of the order.

Count Two alleges that the January 23, 2025 Grady County final order of protection was issued after a hearing of which Gilliland had actual notice and an opportunity to participate, and the order restrained Gilliland from harassing, stalking, and threatening his child and explicitly prohibited the use, attempted use, or threatened use of physical force against such child that would reasonably be expected to cause bodily injury.[7]

This January 23, 2025 final order of protection was issued based on a Petition for Protective Order filed by Devan Whitten (Gilliland's daughter) on October 28, 2024. In that Petition, Ms. Whitten alleges that she was a victim of harassment and stalking at the hands of Gilliland. The final order of protection specifically notes "NO FINDING OF DOMESTIC ABUSE AND/OR STALKING OF INTIMATE PARTNER OR CHILD. Federal Firearms Prohibition does not apply."[8] The order is thus presumably based on a finding that Gilliland had harassed Ms. Whitten, as that is the only other basis upon which Ms. Whitten petitioned for the order.[9]

---

[7] While not referenced in the Superseding Indictment, the order also prohibited Gilliland from "use, attempted use or threatened use of physical force against the protected person(s) that would reasonable be expected to cause bodily injury."  Grady Cnty. Final Protective Order (Dkt. 50-3), at 3.

[8] *Id*. at 2.

[9] "Harassment" is defined in Appendix 2 of the Petition for Protective Order as "[a] knowing and willful course of conduct by a family or household member or an individual who is or has been involved in a dating relationship with the person, directed at a specific person which seriously alarms or annoys the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial distress to the person. 'Harassment' shall include, but not be limited to, harassing or obscene telephone calls in violation of Section 1172 of Title 21 of the Oklahoma Statutes and fear of death or bodily injury."

### Procedural History

Gilliland was originally charged in a single count indictment that alleged a violation of 18 U.S.C. § 922(g)(8) based on Gilliland's alleged possession of the .22LR rifle on October 18, 2024. The original indictment alleged that this possession was unlawful because Gilliland:

> was subject to a court order issued after a hearing of which he had received actual notice, and at which he had an opportunity to participate. That court order, specifically: PO-2024-448, issued on or about July 17, 2024, by the District Court of Comanche County, Oklahoma[.][10]

Gilliland filed a motion to dismiss the indictment (Dkt. 29), pointing out that the July 17, 2024 order, was an ex parte order of protection issued without a hearing of which he had actual notice and an opportunity to participate. At a hearing on the motion, the government conceded that point but argued that the subsequent August 22, 2024 order was the operative order that satisfied § 922(g)(8)'s requirement of an order issued *after* a hearing of which Gilliland had actual notice and an opportunity to participate. After that hearing, the government filed the superseding indictment (Dkt. 44), which amends Count One to reference the August 22, 2024 order and adds Count Two.

Gilliland promptly filed the instant motion to dismiss the superseding indictment (Dkt. 50). Gilliland argues that both counts are statutorily deficient. As to Count One, he again argues that the Emergency Order of Protection issued on July 17, 2024, was not issued after a hearing of which he had actual notice and an opportunity to participate, as required by § 922(g)(8). And as to the subsequent August 22, 2024 hearing at which he

---

[10] Indict. (Dkt. 1), at 1.

had notice and was present, Gilliland disputes that he had the requisite opportunity to participate because the judge continued the hearing to a later date and made no ruling on the merits of the protective order request. Gilliland further argues that even if he had an opportunity to participate at that hearing, no protective order was issued after the hearing. Rather, the Comanche County judge merely ordered that his *previously issued* protective order remain in effect until a hearing could be completed. This, Gilliland says, isn't what § 922(g)(8) requires.

As to Count Two, he concedes that the March 27, 2025 Comanche County Final Order of Protection satisfies § 922(g)(8)'s requirements. He argues that the January 23, 2025 Grady County Final Order of Protection, however, is deficient because it was issued on behalf of Gilliland's *adult* daughter, who he claims is not a "child" within the meaning of § 922(g)(8). In his view, the statute only contemplates *minor* children, or at least children who remain in the household with an intimate partner. He thus requests that Count Two be modified to omit reliance on that protective order.

Gilliland also raises both a facial and as-applied Second Amendment challenge to § 922(g)(8)(c)(ii). He acknowledges that this facial challenge is foreclosed by the Tenth Circuit's recent decision in *United States v. Gordon*.[11] His as-applied challenge centers on his claim that the various protective orders in this case lack any implicit or explicit finding that he was a credible threat to the physical safety of an intimate partner or child. Furthermore, he argues, the Grady County Final Order of Protection explicitly stated that

---

[11] 137 F.4th 1153 (10th Cir. 2025); *see* Def.'s Mot. to Dismiss (Dkt. 50), at 7.

there was "no finding of domestic abuse and/or stalking," and that "federal firearm restrictions" did not apply to him as a result of the order.

The government responds that Count One states an offense because while it may point to the July 17, 2024 ex parte temporary order of protection as the protective order triggering § 922(g)(8)'s prohibition on Gilliland possessing a firearm (which concededly would not satisfy § 922(g)(8) standing alone), Count One also refers to the subsequent August 22, 2024 order in which the presiding judge directed that the ex parte protective order "remain in full force and effect" pending further hearing. And, the government argues, Gilliland had notice of that August 22, 2024 hearing and was present and had an opportunity to participate. The Comanche County judge's order keeping the July 17, 2024 ex parte temporary order of protection in place is thus, in the government's view, the type of order contemplated by § 922(g)(8). The government further argues that Gilliland's signature acknowledging that order constitutes his "agreement" to the Temporary Order of Protection remaining in effect pending further hearing.[12]

As to Count Two, the government argues that the statutory challenge to the reliance on the Grady County Final Order of Protection fails because that order was undisputedly issued to Gilliland's child. And in the government's view, § 922(g)(8) covers protective orders sought by even adult children living in a separate household from Gilliland's former "intimate partner" (i.e., his ex-wife) because no statutory limit is placed on who is a "child."

---

[12] Mot. Hearing (Dkt. 58), at 2:55 p.m. (recording on file with court). This argument is meritless. Gilliland's "acknowledgment" of the order cannot possibly be understood to be his *agreement* to the order, both on its own terms and in light of the fact the "acknowledgment" came at a *contested hearing* on the protective order.

As to the as-applied Second Amendment challenge, the government argues that an Oklahoma Order of Protection that prohibits a person from "injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering with the protected person(s)"[13] and prohibits them from the "use, attempted use or threatened use against the protected person(s) that would reasonably be expected to cause bodily injury"[14] is necessarily supported by a finding that the prohibited person is a "credible threat to the physical safety" of their intimate partner or child. And even if that isn't implicit in the order, says the government, every Oklahoma "Order of Protection" includes an explicit finding that "a Final Order of Protection is necessary to protect the Petitioner(s)."[15] And that, argues the government, more than alleviates any constitutional concerns.

## *Analysis*

### I.     The Statutory Challenges

#### A.     Count One

18 U.S.C. § 922(g)(8) criminalizes possession of a firearm by persons subject to certain protective orders. As a threshold matter, § 922(g)(8)(A) limits application of the prohibition to only those protective orders "issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate." This process requirement is at the heart of Gilliland's challenge to Count One.

---

[13] Grady Cnty. Final Protective Order (Dkt. 50-3), at 3.

[14] *Id.*

[15] Oklahoma Administrative Office of the Courts, *Final Order of Protection* (Oct. 3, 2025), available at https://www.oscn.net/forms/aoc/protective-orders/.

As recounted above, Count One of the Superseding Indictment describes the July 17, 2024 ex parte emergency order of protection as the order triggering § 922(g)(8)'s application to Gilliland. But both parties agree that the ex parte order does not satisfy § 922(g)(8)(A)'s process requirement. The government believes, however, that the subsequent August 22, 2024 order, which was issued at a hearing of which Gilliland had notice and was present, cures this deficiency.

To be sure, § 922(g)(8) does not prescribe any particular form for the "court order" that triggers its application, but it does prescribe content requirements in addition to the process requirements described above. The order must restrain "such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child."[16] The order must also include either (1) "a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or (2) terms that explicitly prohibit "the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury."[17]

And therein lies the issue with the August 22, 2024 order. It was certainly issued after "a hearing" of which Gilliland had actual notice (whether he had an opportunity to

---

[16] 18 U.S.C. § 922(g)(8)(B).

[17] *Id.* § 922(g)(8)(C)(i)–(ii).

participate in that hearing remains in dispute), and it keeps the prior order in "full force and effect." But it does not itself contain the requisite prohibitions.[18]

But the August 22, 2024 order was a re-issuance of the July 17, 2024 ex parte order. That July 17, 2024 order explicitly states that "[t]his Emergency Order shall remain in effect until after the full hearing is conducted,"[19] as does every such order because it is part of the standard form for such orders that is created and promulgated by the Oklahoma

---

[18] In addition to ordering the prior order to remain in effect, it "FURTHER FINDS and ORDERS that defendant(s) is restrained and prohibited from any and all intentional and avoidable contact with the Petitioner(s) except as otherwise allowed by appropriate court order(s)." Aug. 22 Order (Dkt. 50-2), at 1. While that isn't the precise prohibition described in § 922(g)(8)(C)(ii), it is a prohibition that seems broad enough to encompass the conduct that must be prohibited. After all, prohibiting someone from "all intentional and avoidable contact" necessarily includes conduct that would amount to "the use, attempted use, or threatened use of physical force against [an] intimate partner or child that would reasonably be expected to cause bodily injury[.]" But precisely because it reaches so much more contact, this "no contact" provision isn't "substantially similar in meaning" to the more specific prohibitions described in (C)(ii). *See e.g., United States v. Sanchez*, 639 F.3d 1201, 1204–05 (9th Cir. 2011) ("(8)(C)(ii) is satisfied by a court order that includes explicit terms similar—if not identical—in meaning to the use of physical force that would reasonably be expected to cause bodily injury.") (order prohibiting contact alone but not physical force, abuse, or harm does not satisfy (C)(ii)) (internal quotation marks omitted); *and see United States v. Bostic*, 168 F.3d 718, 722 (4th Cir. 1999) (order directing defendant to "refrain from abusing" his partner is sufficient); *United States v. Hopper*, 28 Fed. App'x 376, 379 (6th Cir. 2001) (order preventing defendant from "committing further acts of domestic violence and abuse" is sufficient); *United States v. Coccia*, 446 F.3d 233, 235, 241–42 (1st Cir. 2006) (injunction prohibiting defendant from "abusing, harassing, or threatening" his wife and children is sufficient); *United States v. DuBose*, 598 F.3d 726, 730–31 (11th Cir. 2010) (per curiam) (order forbidding defendant from "intimidating, threatening, hurting, harassing" is sufficient); *United States v. McGinnis*, 956 F.3d 747, 759–60 (5th Cir. 2020) (order barring defendant from "committing family violence against" his partner is sufficient).

[19] July 17 Order (Dkt. 50-1), at 2.

Administrative Office of the Courts.[20] This isn't entirely consistent, however, with Oklahoma law because 22 O.S. § 60.3(C)(1) says "the emergency temporary ex parte order shall be in effect until the court date that was assigned by the court during the approval of the order," which isn't the same as saying the order "shall remain in effect until *after the full hearing* is conducted."[21] Rather, it appears that Oklahoma law only allows a temporary protective order to remain in place only until the hearing that must occur within 14 days, but not longer.[22] This understanding is confirmed by 22 O.S. § 60.4(B)(3), which provides that "if service has not been made on the defendant at the time of the hearing, the court shall, at the request of the petitioner, issue a new emergency order reflecting a new hearing date and direct service to issue." This understanding is further confirmed by the state judge's August 22, 2024 order, which seemingly assumes that the temporary protective order would expire as a matter of law on that day unless extended. All that to say, the Court is satisfied that the August 22, 2024 order, both on its own terms and as an operation of law, constituted a re-issuance of the July 17, 2024 temporary protective order. And that July 17, 2024 order contains the prohibitions required by § 922(g)(8).

Of course, whether Gilliland had an opportunity to participate in the August 22, 2024 hearing has been disputed, and that is a fact question that must be resolved at trial.

---

[20] Oklahoma Administrative Office of the Courts, *Final Order of Protection* (Oct. 3, 2025), available at https://www.oscn.net/forms/aoc/protective-orders/.

[21] *See id.* (emphasis added).

[22] 22 O.S. § 60.3(C)(1) ("The emergency temporary ex parte order shall be in effect until the court date that was assigned by the court during the approval of the order. Emergency temporary ex parte orders shall be heard within fourteen (14) days after issuance.").

For all these reasons, the motion to dismiss Count One of the Superseding Indictment as a statutory matter must be rejected at this stage.

### B.    Count Two

Section 922(g)(8)(B) requires that the underlying protective order "restrains [defendant] from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." Thus, Section 922(g)(8) only applies protective orders obtained by three categories of petitioners: intimate partners, the intimate partner's child, or the defendant's child.

Count Two of the Superseding Indictment alleges that Gilliland unlawfully possessed firearms while subject to two such qualifying protective orders, one of which was obtained by Gilliland's adult daughter. Gilliland argues that Count Two must be dismissed—or, in the alternative, the reference to the daughter's order should be struck—because his daughter's protective order does not satisfy the statutory requirements of § 922(g)(8). Specifically, Gilliland asserts that his 26-year-old daughter does not qualify as a "child" because she is not a minor.[23]

Gilliland makes three arguments in support of reading "child" to refer exclusively to "minor child." First, he argues that the term "child" plainly means "minor child" and excludes adult offspring. Second, he argues that the statutory structure and legislative context of § 922(g)(8) confirm that Congress intended "child" to mean a minor child. Third,

---

[23] It is undisputed that Gilliland's daughter does not fall within the broad definition of "intimate partner." *See* 18 U.S.C. § 921(32).

he argues that the broader context of federal statutory usage supports this interpretation, as "child" throughout the United States Code uniformly excludes twenty-six-year-old children. The Court addresses each argument in turn before finally addressing the rule of lenity, which Gilliland argues supports his narrow reading of "child."

### 1.    Plain Meaning

Because Congress did not define "child," the Court must interpret the term with its "ordinary meaning … at the time Congress enacted the statute."[24] Congress adopted § 922(g)(8) in 1994. And, at that time, "child" was ordinarily understood to have both a non-familial meaning: "an unborn or recently born human being," and a familial meaning: "a son or daughter," with the latter not referencing age.[25]

Because "child" is used in § 922(g)(8) in the familial sense, the plain meaning of the term includes any "son or daughter," regardless of age. This understanding of the term is confirmed by the statutory context and structure.

### 2.    Statutory Context and Structure

Congress enacted § 922(g)(8) as part of the Violence Against Women Act within the Violent Crime Control and Law Enforcement Act of 1994. Gilliland argues that including adult offspring in the definition of "child" does not comport with Congress's focus on curbing domestic violence between romantic partners.

---

[24] *Perrin v. United States*, 444 U.S. 37, 42 (1979).

[25] Webster's Third New Int'l Dictionary 388 (3d ed. 1993); *see* Black's Law Dictionary 239 (6th ed. 1990) (defining child as "progeny, offspring of parentage" and "[u]nborn or recently born human being").

But even assuming arguendo that Congress was only concerned with curtailing violence between romantic partners, interpreting § 922(g)(8) to include adult offspring is consistent with that purpose. A child upon turning eighteen does not stop being a potential tool of coercion or intimidation an abuser may wield against his intimate partner. Nor does it matter that adult children are more likely to live apart, as even minor children can reside separately (e.g., with another parent or relative) yet still serve as a conduit of abuse. The broad reach of the statute when it comes to distance underscores that Congress's concern was not cohabitation, but the abuser's ability to exploit the parent-child relationship as a means of control.

Gilliland further relies on the structure of § 922(g)(8)(B), which contemplates two types of qualifying protective orders: (1) those restraining a person from harassing, stalking, or threatening an intimate partner or the child of the partner or person, and (2) those restraining conduct that would place an intimate partner in fear of bodily injury to the partner or child. Gilliland highlights that the second clause focuses exclusively on the partner's fear, not on fear experienced by the child. According to Gilliland, this structure makes sense only if "child" refers to minor children of the intimate partner. If Congress had intended to include adult offspring, Gilliland argues, it would have drafted the provision to encompass conduct placing such a child in fear of injury.

That inference does not follow from § 922(g)(8)(B)'s structure. First, § 922(g)(8)(B)'s first clause includes a protective order that "restrain[] [defendant] from harassing, stalking, or threatening … [a] child of … [defendant]." It is thus impossible to draw from the text the broader inference that Gilliland urges: that Congress was only

15

worried about protecting intimate partners. Moreover, the two clauses merely distinguish between two categories of harm Congress sought to prevent: direct threats against an intimate partner or child *and* conduct that instills fear of such harm in the partner. The clause's focus on the partner's fear simply reflects Congress's understanding that domestic abuse often operates through indirect means, including threats toward intimate partner's children. The omission of fear directed at the child therefore cannot function to narrow the plain meaning of "child."

### 3.    Federal Usage

Finally, Gilliland argues that Congress defines "child" in other parts of the United States Code to only include children under certain ages.[26] But "[w]e generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."[27] And "[a]textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."[28]

Congress's omission of any age qualifier, particularly when it defined "child" elsewhere in the same omnibus legislation, demonstrates that no such limitation was intended. Indeed, other provisions within the Violent Crime Control and Law Enforcement Act expressly restrict "child" to minors, but they do so where the age limitation is inherent

---

[26] 18 U.S.C. § 3559(f) (setting mandatory minimum terms of imprisonment for violent crimes against children under eighteen years old); 42 U.S.C. § 1397jj(c)(1) (defining "child" as an individual under nineteen years of age for purposes of the State Children's Health Insurance Program); 25 U.S.C. § 1903(4) (limiting "Indian child" to persons under eighteen years old).

[27] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) (Marshall, J.).

[28] *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (Thomas, J.).

in the statute's purpose. For example, the Local Crime Prevention Block Grant Program and the Community Schools Youth Service and Supervision Grant Program Act both target juvenile violence and youth development; their age-specific definitions of "child" are indispensable to those aims.[29] Similarly, statutes addressing child molestation or child abuse necessarily hinge on the victim's age.[30] In contrast, § 922(g)(8) addresses domestic abuse—a context defined by relational dynamics, not age.

Therefore, where Congress found it necessary to tie "child" to a particular age, it said so. Its choice not to do so in § 922(g)(8) should be read as deliberate.[31] And as explained above, giving "child" its plain meaning does not frustrate Congress's purpose; it advances it.

### 4. The Rule of Lenity

"The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."[32] Yet lenity is a rule that should "rarely if ever come[]] into play."[33] Before applying the rule courts should first exhaust all traditional tools of

---

[29] Local Crime Prevention Block Grant Program, 42 U.S.C. § 13758(4) (repealed 2006); Community Schools Youth Service and Supervision Grant Program Act of 1994, 34 U.S.C. § 12161(b).

[30] Fed. R. Evid. 414 (addressing evidence of similar crimes in child molestation cases) ("For purposes of this rule and Rule 415, 'child' means a person below the age of fourteen."); Fed. R. Evid. 415 (addressing evidence of similar acts in civil cases concerning sexual assault or child molestation).

[31] *Russello v. United States*, 464 U.S. 16, 23 (1983).

[32] *United States v. Santos*, 553 U.S. 507, 514 (2008).

[33] *Wooden v. United States*, 595 U.S. 360, 377 (2022) (Kavanaugh, J., concurring).

statutory interpretation because the rule "only serves as an aid for resolving an ambiguity; it is not to be used to beget one[.]"[34]

Here, the statute's text and context readily lead to the conclusion that "child" in § 922(g)(8)(B) encompasses adult offspring. And interpreting "child" to include adult sons and daughters accords with § 922(g)(8)'s preventive purpose and avoids creating an arbitrary gap in protection for victims of domestic abuse. Thus, there is no work for the rule lenity to do. Because the protective order obtained by Gilliland's adult daughter falls squarely within the statute's scope, the Court declines to dismiss or narrow Count Two as statutorily deficient.

## II.    The Second Amendment Challenges

Gilliland acknowledges that his facial challenge to 18 U.S.C. § 922(g)(8)(C)(ii) is foreclosed by the Tenth Circuit's recent decision in *United States v. Gordon*. In *Gordon*, the Tenth Circuit concluded that § 922(g)(8)(C)(ii) was facially constitutional by examining whether § 922(g)(8)(C)(ii) was constitutional as applied to Gordon.[35] Concluding that it was, the Circuit rejected the facial challenge because the constitutionality of the statute as applied demonstrated that it wasn't unconstitutional in all applications.[36]

---

[34] *United States v. Turkette*, 452 U.S. 576, 587 n. 10 (1981).

[35] *Gordon*, 137 F.4th at 1155.

[36] *Id.*

In conducting *Gordon*'s as-applied analysis, the Tenth Circuit started where the Supreme Court left off in *United States v. Rahimi*.[37] In *Rahimi,* the Supreme Court rejected a facial challenge to § 922(g)(8)(C)(i). Of particular relevance here, the *Rahimi* court pointed to the fact that (C)(i) applies "only once a court has found that [a] defendant represents a credible threat to the physical safety of another."[38] In the *Gordon* panel's view, this was critical because if "*Rahimi* allows a court to disarm a 'threatening individual' if it makes [an express] judicial determination that the 'individual poses a clear threat of physical violence to another,[39] (C)(ii) 'establishes the same point by reasonable inference from the fact that a defendant is subject to [an order prohibiting such behavior].'"[40]

Gordon argued that the takeaway from *Rahimi* was that only firearm prohibitions based on an "*explicit* judicial finding, founded on evidence, of a clear future threat of violence to others," satisfies the Second Amendment.[41] The *Gordon* panel disagreed. It found "no reason to impose an explicit-written-finding requirement…particularly when the inference of a finding is [as] strong" as it was in Gordon's case.[42] The court noted that § 922(g)(8)(C)(i) was enacted by Congress "against the backdrop of the almost universal

---

[37] 602 U.S. 680 (2024).

[38] *Id.* at 699.

[39] *Gordon,* 137 F.4th at 1156 *(*quoting *Rahimi*, 602 U.S. at 698).

[40] *Id.* at 1156-57 (quoting *United States v. Chapman*, 666 F.3d 220, 228 (4th. Cir. 2012)). To be fair, the Fourth Circuit wasn't analyzing (C)(ii) in light of *Rahimi*, as the *Chapman* decision long pre-dates *Rahimi*, but the *Gordon* panel thought the reasoning of the Fourth Circuit apt even in light of the significant changes in Second Amendment law that had occurred in the years since.

[41] *Id.* at 1157 (quoting Gordon Br. at 17).

[42] *Id.*

rule of American law that for a temporary injunction to issue, there must be a *likelihood* that irreparable harm will occur."[43] In other words, Congress had safely assumed that state law wouldn't allow a state judge to impose the (C)(ii) prohibitions on a person unless there was at least an *implicit* finding by the state judge that the person posed a clear threat of physical violence to another.

And in the case of the Utah laws that underlay Gordon's protective orders, the *Gordon* panel readily concluded that they supported Congress's assumption. After all, Utah law only authorizes the issuance of a "cohabitant-abuse protective order" where it appears that "domestic violence or abuse has occurred" or that "there is a substantial likelihood [that] domestic violence or abuse will occur."[44] Furthermore, Utah law allowed such an order to prohibit the respondent "from purchasing, using, or possessing a firearm" only in cases where the court "find[s] that the respondent's use or possession of a weapon may pose a serious threat of harm to the petitioner."[45] And Gordon's protective order contained just such a prohibition.

In other words, resolving this as-applied challenge to § 922(g)(8)(C)(i) requires an examination of the Oklahoma protective orders at issue here, as well as an examination of the Oklahoma laws underlying those protective orders, to ensure that the orders are predicated on either an explicit or implicit finding that Gilliland posed a clear threat of physical violence to another. While this case involves several complicating facts that

---

[43] *Id.* (quoting *United States v. Perez-Gallan,* 125 F.4th 204, 214 (5th Cir. 2024)).

[44] Utah Code Ann. § 78B-7-603(1)(b) (2023).

[45] *Id.* at § 78B-7-603(2)(f), (3)(a).

weren't present in *Gordon*, the Court concludes that the orders at issue are predicated on just such a finding.

### A.    Count One

Count One is predicated on the August 22, 2024 order issued by the District Court of Comanche County. As explained above, this order renewed the July 17, 2024 Emergency Ex Parte Order of Protection while also further finding and ordering that Gilliland "is restrained and prohibited from any and all intentional and avoidable contact with the Petitioner."[46]

Under Oklahoma law, a court may, for good cause shown at a hearing, issue an Emergency Ex Parte Order of Protection "that it finds necessary to protect the victim from immediate and present danger of domestic abuse, stalking, or harassment."[47] The Petition for Protective Order alleges that the petitioner was a victim of all three and the Emergency Ex Parte Order of Protection was issued based on that petition. While the order does not specify the grounds upon which it is based (i.e., whether it was domestic abuse, stalking, or harassment, or some combination of the three), it prohibits Gilliland from "injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering" with the petitioner and from "use, attempted use or threatened use of physical force against [the petitioner] that would reasonably be expected to cause bodily injury."[48] It further prohibits Gilliland from "engaging in other conduct that would place [the

---

[46] Aug. 22 Order (Dkt. 50-2), at 1.

[47] 22 O.S. § 60.3(A).

[48] July 17 Order (Dkt. 50-1), at 2.

petitioner or her household members or relatives] in reasonable fear of bodily injury[.]"[49] Lastly, the order directed that Gililland "immediately surrender all firearms and dangerous weapons within [his] possession or control and any concealed carry license to law enforcement."[50] The order also contains a boilerplate finding that "an Emergency Ex Parte Order is necessary to protect the Petitioner[s] pursuant to the Protection from Domestic Abuse Act[.]"[51]

While that boilerplate finding doesn't specify what conduct Gilliland engaged in to warrant issuance of the order, such an order can only be issued upon a finding that it is "necessary to protect the victim from immediate and present danger of domestic abuse, stalking, or harassment,"[52] so that finding is implicit in the order. But in Gilliland's view, the rule of lenity requires that the Court employ something akin to the "categorical approach," and assume that the finding was of the least problematic behavior—in this case, harassment. But neither the rule of lenity nor the categorical approach have any application in this context. The former is a canon of statutory interpretation used to resolve ambiguities in statutory text, while the latter is used to resolve certain questions in a specific context not present here.[53]

---

[49] *Id.*

[50] *Id.* at 3.

[51] *Id.* at 1.

[52] 22 O.S. § 60.3(A).

[53] The much-maligned categorical approach is employed to determine whether a prior conviction qualifies as a specific type of offense under federal statutes (e.g. whether a state conviction qualifies as a "crime of violence" for certain federal law purposes). *Mathis v. United States*, 579 U.S. 500, 504–05 (2016) (describing the categorical approach).

In any event, the "the almost universal rule of American law" identified by the *Gordon* panel just so happens to be the rule in Oklahoma. Oklahoma courts have recognized that a protective order under the Protection from Domestic Abuse Act is "analogous to an injunction,"[54] and under Oklahoma law an injunction cannot issue unless there is a "reasonable probability that the injury sought to be prevented will be done if no injunction is issued—a mere fear or apprehension of injury [is not] sufficient."[55] And because an "injunction is an extraordinary remedy that should not be lightly granted…[e]ntitlement to injunctive relief must be established in the trial court by clear and convincing evidence and the nature of the complained of injury must not be nominal, theoretical or speculative."[56]

In other words, for the issuing court to have enjoined Gilliland from the "use, attempted use or threatened use of physical force against [the petitioner] that would reasonably be expected to cause bodily injury," it must necessarily have found by clear and convincing evidence that there was a reasonable probability that Gilliland would engage in precisely that conduct. The state court therefore implicitly found that Gilliland posed a clear threat of physical violence toward his ex-partner. And according to the *Gordon* panel, that implicit finding is enough to satisfy the Second Amendment.[57]

---

[54] *Curry v. Streater*, 2009 OK 5, ¶ 8, 213 P.3d 550, 554.

[55] *Sharp v. 251st St. Landfill, Inc.*, 1996 OK 109, ¶ 5, 925 P.2d 546, 549.

[56] *Id.* (internal citations omitted).

[57] *Gordon*, 137 F.4th at 1157.

### B.    Count Two

Count Two is predicated on the Grady County and the Comanche County Final Orders of Protection. As required by Oklahoma law, both Final Orders of Protection are on a standardized form for such orders that are promulgated by the Oklahoma Administrative Office of the Courts.[58] As mentioned above, both orders contain some peculiarities in the standardized findings portion of the form order. The Comanche County order contains no explicit finding, while the Grady County order contains an explicit finding of "NO FINDING OF DOMESTIC ABUSE AND/OR STALKING OF INTIMATE PARTNER OR CHILD. Federal Firearms Prohibition does not apply."[59]

However, regardless of what conduct Gilliland was found to have engaged in to justify issuance of the orders, both orders prohibit Gilliland from "injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering" with the petitioner, from "use, attempted use or threatened use of physical force against [the petitioner] that would reasonably be expected to cause bodily injury," and from "engaging in other conduct that would place [the petitioner] in reasonable fear of bodily injury." So for the reasons given above, the orders necessarily must have been based on an implicit finding of clear and convincing evidence that there was a reasonable probability that Gilliland would engage in precisely that conduct. Thus, for the same reasons given as

---

[58] 22 O.S. § 60.4(D).

[59] As the Government notes, both orders contain a boilerplate finding that "a Final Order of Protection is necessary to protect the Petitioner[s] pursuant to the Protection from Domestic Abuse Act[.]" But that finding doesn't tell us what conduct Gilliland was found to have engaged in warranting the issuance of the orders.

to Count I, the issuing state courts implicitly found that Gilliland posed a clear threat of physical violence toward his ex-partner.[60]

### Conclusion

For these reasons, the Motion to Dismiss the Superseding Indictment is **DENIED**.

**IT IS SO ORDERED** this 28th day of October 2025.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[60] The lack of an explicit finding in the Comanche County Order may well have provided a basis upon which to directly attack the validity of that order. But Gilliland never launched such an attack, and a collateral attack is not appropriate here. *United States v. Reese*, 627 F.3d 792, 804 (10th Cir. 2010).